James A. Bloom
Todd M. Schneider
**SCHNEIDER WALLCE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Fax: (415) 421-7105
E-Mail: jbloom@schneiderwallace.com
       tschneider@schneiderwallace.com

Paul M. Secunda*
*\* Pro Hac Vice Motion Pending*
**WALCHESKE & LUZI, LLC**
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: psecunda@walcheskeluzi.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| CONAN NADO individually, and as a representative of a Class of Participants and Beneficiaries of the John Muir Health 403(b) Plan, | Case No: |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR CLAIMS UNDER ERISA, 29 U.S.C., § 1132(a)(2)** |
| v. | |
| JOHN MUIR HEALTH, and | |
| BOARD OF DIRECTORS OF JOHN MUIR HEALTH, | |
| Defendants. | |

COMES NOW Plaintiff, Conan Nado, individually and as a representative of a Class of Participants and Beneficiaries on behalf of the John Muir Health 403(b) Plan (the "Plan"), by and through his counsel, WALCHESKE & LUZI, LLC, and SCHNEIDER WALLCE COTTRELL KONECKY LLP, as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      Defendants, John Muir Health ("John Muir") and the Board of Directors of John Muir Health ("Board"), are fiduciaries under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* as they exercise discretionary authority or discretionary control over the 403(b) defined contribution retirement plan – known as the John Muir Health 403(b) Plan (the "Plan" or "John Muir Plan") – that it sponsors and provides to its employees.

2.      As fiduciaries, Defendants owed the Plan and participants the duties of undivided loyalty and prudence, duties that are among the highest known to the law and require fiduciaries to perform their obligations solely in the best interests of the participants and beneficiaries.

3.      During the putative Class Period (March 15, 2018, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative (RKA)] fees," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739-740 (2022), and by failing to remove their high-cost, multiple-vendor recordkeepers, Fidelity Investments Institutional Operations ("Fidelity") and Lincoln National Corporation ("Lincoln"), who provided too many Plan investment choices.[1]

4.      During the putative Class Period (March 15, 2018, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duty of loyalty they owed to the Plan by declining to use

---

[1] Based on Form 5500s dating back to 2009, Fidelity/Lincoln have been the multi-vendor recordkeepers of the Plan for at least fifteen years.

forfeited funds in the Plan to eliminate the administrative expenses charged to participant accounts, and instead using such Plan assets to reduce the Company's own contribution expenses.

5.     Plaintiff is a "participant" of the Plan under ERISA Section 3(7), 29 U.S.C. § 1002(7).

6.     The Plan is a Section 403(b) "defined contribution" retirement plan under 29 U.S.C. § 1002(34), meaning that John Muir's contributions to the payment of Plan costs is guaranteed but the retirement benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, *less expenses*." *Tibble v. Edison Int'l,* 575 U.S. 523, 525 (2015) (emphasis added).

7.     John Muir and its Board are both the Plan Sponsor and Plan Administrator of the Plan.

8.     Plaintiff alleges four ERISA violations against Defendants: a violation of the duty of prudence against Defendants under 29 U.S.C. § 1104(a)(1)(B) for charging Plan participants excessive Total RKA fees; a violation of the duty of loyalty for retaining forfeited employer contributions for itself for future plan contributions; and two claims against Defendants for failure to monitor fiduciaries responsible for Plan administration with regard to Plan Total RKA fees and with regard to Plan forfeitures.

9.     More specifically, Count I alleges a breach of the fiduciary duty of prudence by Defendants for incurring unreasonable Total RKA fees through using multiple recordkeepers and providing too many investment choices. Additionally, Defendants *paid over a 258% premium* per-participant for Total RKA fees for the Plan to the Plan recordkeepers, Fidelity and Lincoln, during the Class Period. Defendants should have substantially lowered its Total RKA fees by soliciting bids from competing providers and using its massive size and correspondent bargaining power to negotiate for fee rebates, but it did not do so, or did so ineffectively, during the Class Period.

10.    Counts II alleges a breach of fiduciary duty of loyalty by Defendants by keeping forfeited employer contributions for itself for future employee contributions instead of using those forfeitures to reduce Plan RKA fees for Plan participants.

11.    Count III alleges a breach of fiduciary duty of prudence by Defendants for failing to monitor those individuals responsible for paying unreasonable Total RKA fees.

12.    Count IV alleges a breach of fiduciary duty of loyalty by Defendants for failing to monitor those individuals responsible for retaining forfeiture payments for the employer's own benefit.

13.    Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of loyalty "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan. 29 U.S.C. § 1104(a)(1)(A).

14.    Plan fiduciaries must also discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

15.    The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones ... separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble*, 575 U.S. at 529. This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529–30, and requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *See Hughes v. Northwestern University*, 63 F.4th 615, 626 (7th Cir. 2023) ("*Hughes II*"); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (discussing a fiduciary's duty to keep plan expenses under control).

16.    Plan fiduciaries have a continuing duty to monitor their Total RKA fees to make sure that they are not excessive with respect to the services received.

17.     Plan fiduciaries have a continuing duty to monitor their Plan forfeitures to make sure that forfeitures are used in the best interest of plan participants to defray reasonable expenses of administering the Plan.

18.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Total RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

19.     "To state a claim for breach of fiduciary duty, a complaint does not need to contain factual allegations that refer directly to the fiduciary's knowledge, methods, or investigations at the relevant times." *See Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1070 (N.D. Cal. 2017). After all, "the circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995).

20.     The unreasonable Total RKA fees and retention of forfeiture inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Total RKA services, given their level and quality, were improvident and that forfeitures should have been used to defray administrative expenses.  The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees. *See Hughes II*, 63 F.4th at 628.

21.     These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and retention of Plan forfeitures for the employers' own benefit.

22.     To remedy these fiduciary breaches, Plaintiff brings this action in a representative capacity on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

**JURISDICTION AND VENUE**

23.    This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

24.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

25.    Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

26.    In conformity with 29 U.S.C. § 1132(h), Plaintiff served this Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

**PARTIES**

27.    Plaintiff Conan Nado is a resident of the State of California and currently resides in Los Banos, California. At all relevant times and throughout the Class Period, Mr. Nado has been a participant in the Plan under 29 U.S.C. § 1002(7).

28.    Plaintiff was employed by John Muir Health from March 2014 through September 2018, in the Test Automation position at the Walnut Creek, California, John Muir facility, at which point he retired.

29.    During the Class Period, Plaintiff invested in the following funds: Vanguard Target Retirement 2020, Vanguard Target Retirement 2030, Vanguard Institutional Index Plus, Vanguard Total Bond Market Institutional, Vanguard Bond Index Institutional, and Fidelity 500 Index. Plaintiff is still currently enrolled in the Plan.

30.    Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries to his own Plan account through paying excessive Total RKA fees and

having forfeiture monies retained by John Muir during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Fidelity and Lincoln as its recordkeepers and to withholding forfeiture money to defray Plan expenses, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiff and Class.

31.    Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injuries.

32.    The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Total RKA fees and forfeiture money retention) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

33.    Having never managed a massive 403(b) Plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan and how forfeiture monies should have been applied in their best interest.

34.    Defendant Juniper Muir Health ("John Muir") includes two of the largest medical centers in Contra Costa County: John Muir Health Walnut Creek Medical Center, a 554-licensed bed medical center that serves as Contra Costa County's only designated trauma center; and John Muir Health Concord Medical Center, a 244-licensed bed medical center in Concord. The John Muir Health Physician Network is a not-for-profit medical foundation with more than 1,000 primary care and specialist physicians. Its principal headquarters are located at 1601 Ygnacio Valley Road, Walnut Creek, California 94598. In this Complaint, "John Muir" refers to the named Defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

35.    John Muir acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. John Muir and its Board appointed other Plan fiduciaries to administer and manage the Plan and accordingly had a

concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, John Muir and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

36.    The Plan is also administered by Defendants. As the Plan Administrators, Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Defendants have the authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

37.    In 2022, the Plan had $1,050,759,092 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had more bargaining power regarding Plan fees and expenses than almost any other 401(k) plans in the United States. Defendants, however, did not regularly monitor Fidelity and Lincoln to ensure that they remained the prudent and objectively reasonable choices to provide Total RKA services, as illustrated by not reducing its Total RKA fees sufficiently.

38.    With 7177 participants with account balances in 2022, the Plan had more participants than 99.77% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year. Similarly, with $1,050,759,092 in assets in 2022, the Plan had more assets than 99.86% of the defined contribution plans in the United States that filed 5500 forms for the 2022 Plan year.

## RECORDKEEPING AND ADMINISTRATION ("RKA") SERVICES AND FEES

39.    Employers must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be prudent choices.

40.    Defined contribution plan fiduciaries of 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan

services providers commonly and generically referred to as "recordkeepers," that have developed Total service offerings that can meet all the needs of massive retirement plans with a prudent and materially similar level and caliber of services. Fidelity and Lincoln are two such recordkeepers.

41.     There are numerous recordkeepers in the marketplace who are *equally* single recordkeepers, including Fidelity itself, capable of providing a high level of service to defined contribution plans like the John Muir Plan.

42.     All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide materially similar RKA services to maintain the same profit margin rate.

43.     There are three types of RKA services provided by all recordkeepers.

44.     The first type, "Total RKA," include:

    a.      Recordkeeping;

    b.      Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

    c.      Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

    d.      Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

    e.      Maintenance of an employer stock fund;

    f.      Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.      Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

h.      Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

i.      Trustee/custodian services.

45.     These recordkeeping services are fungible and commoditized, and are standard services provided by all major recordkeepers for ERISA 403(b) and 401(k) plans.

46.     According to the John Muir Health Plan's Required Disclosure Information as of December 31, 2022, "Plan administrative fees may include recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan. Some plans may deduct these fees and expenses from individual accounts in the Plan."

47.     Given the use of the phrase "some plans," there is nothing in these Required Disclosures to suggest that there is anything exceptional, unusual, or customized about the Total RKA services provided to John Muir Plan participants by Fidelity and Lincoln.

48.     The Plan provided participants all the same commoditized and fungible Total RKA services provided to all other massive 401(k) plan participants discussed in paragraph 43 above. The quality or type of Total RKA services provided by competitor recordkeepers are comparable to that provided by Fidelity and Lincoln. Any differences in these Total RKA services are immaterial to the price quoted by recordkeepers for such services.

49.     Given the fungibility and commoditization of these Total RKA services for massive plans like the John Muir Plan, failing to adjust fee arrangements, solicit bids, or negotiate for

rebates with existing recordkeepers, all violate a fiduciary's duty of prudence under ERISA. *See Hughes II*, 63 F.4th at 625-626.

50.     Based on Plan 5500 Forms between 2018 and 2023, Fidelity and Lincoln in fact charged Plaintiff and Class Members about $129 annually on average per year deducted quarterly per participant for Total RKA.

51.     Since well before 2018, industry experts have maintained that for massive retirement plans like the John Muir Plan, prudent fiduciaries treat Total RKA services as a commodity with little variation in price.

52.     "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers:    Separating    Commodity    from    Value-Added    Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

53.     Because RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for massive plans like the John Muir Plan.

54.     Total RKA services are essentially fungible and the market for them is highly competitive. This highly competitive RKA market is filled with equally capable recordkeepers, similar to Fidelity and Lincoln, who can provide comparable Total RKA services for less if only asked to provide bids to plans like the John Muir Plan.

55.     Given the mammoth size of the John Muir Plan, the same price paid by the John Muir Plan for Total RKA over the Class Period, and the trend of price compression for Total RKA

over the last six years, Plaintiff can infer that Defendants did not engage in any competitive solicitation of RKA bids, or only ineffective ones, breaching ther fiduciary duties of prudence.

56.    The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

>    a.    Loan processing;
>
>    b.    Brokerage services/account maintenance;
>
>    c.    Distribution services; and
>
>    d.    Processing of Qualified Domestic Relations Orders (QDROs).

57.    According to the John Muir Health Plan's Required Disclosure Information as of December 31, 2022, the Plan provided all these individual usage services to participants for various fees.

58.    The third type of RKA fees are Ad Hoc fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

59.    According to the According to the John Muir Health Plan's Required Disclosure Information as of December 31, 2022, either no such fees were paid by the Plan or were improperly not disclosed.

60.    Total RKA fee numbers represent the best methodology for determining apples-to-apples comparisons of plans as far as what is being charged for Total RKA services.

61.    The methodology utilized in this Complaint for calculating the Total RKA for both the John Muir Plan and for all the comparison plans discussed below contains the following seven steps:

a.  taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

b.  reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets;

c.  reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

d.  Cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

e.  utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

f.   reviewing the notes of the Audited Financial Statement attachment to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g.  reviewing the results for reasonableness and make revisions as appropriate based on Plaintiff's non-testifying experts' experience in evaluating plans with(?) the different recordkeepers.

62.    Because the Total RKA offerings are fungible among all recordkeepers who provide services to massive plans, like the John Muir plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the recordkeeper's "revenue requirement" is on a per participant basis for providing the Total RKA services.

63.    This approach is validated by the structure of the request for proposals (RFPs) sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

64.    Fidelity, the largest 401k recordkeeper in the country, has in fact conceded that the Total RKA services that it provides to other massive plans are commodified, including the plan services provided to its own employees.

65.    As part of stipulated facts in a previous case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period*

*(November 18, 2014 to the present).*" *See Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

66.    The investment options selected by plan fiduciaries often have a portion of the Total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

67.    Recordkeepers often collect a portion of the Total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

68.    Revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment.

69.    Because revenue sharing arrangements provide asset-based compensation for the recordkeeper, prudent fiduciaries  monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided.

70.    A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee.

71.    Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to have their high-priced funds included as plan investment options.

72.    According to the John Muir Health Plan's Required Disclosure Information as of December 31, 2022, as well as the Plan 5500 forms, the John Muir Plan paid both direct and indirect RKA fees during the Class Period to Fidelity and Lincoln.

*Nado v. John Muir Health et al.*          CLASS ACTION COMPLAINT          Case No.

14

## ERISA FIDUCIARY STANDARDS FOR SELECTING
## AND MONITORING RECORDKEEPERS

73.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

74.     Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of Total RKA fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

75.     It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

76.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide a materially similar level and qualities of services for a more competitive reasonable fee if necessary.  Plan fiduciaries treat RKA services as a commodity or fungible when negotiating RKA fees.

77.     An internal benchmarking survey from CapTrust, Fiduciary Decisions/Benchmarks, or similar company, is inadequate to determine a reasonable Total RKA fee. Such benchmarking surveys skew to higher "average prices," that favor inflated Total RKA fees. To receive a "reasonable" Total RKA fee in the prevailing market, investment consultants routinely advise plan fiduciaries to engage in solicitations of competitive RKA bids on a periodic basis of every three to five years.

78.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA fees. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

79.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

80.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

81.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly

and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

82.    Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes II*, 63 F.4th at 625-626.

## FAR TOO MANY INVESTMENT CHOICES

83.    The sheer volume of nearly one hundred and fifteen (115) total investment choices for retirement investors like Plaintiff indicates that Defendants failed properly to monitor and evaluate the historical performance and expense of each of these funds, compare that historical performance and expense to a peer group of funds and/or even compare the three segments -- comprised of Fidelity and Lincoln offerings -- against one another.

84.    Defendants have done what the DOL and at least one federal appellate court have warned against: they have stuffed the Plans' investment menus with a hundred possible investments and then shifted to the participants the responsibility for choosing among this vast array.

85.    This strategy chosen by Defendants results in the inclusion of many investment alternatives that were duplicative, that a responsible fiduciary should exclude, and unreasonably burdens Plan participants who do not have the resources to pre-screen investment alternatives in the way Defendants do.

86.    The designation of nearly hundred and fifteen investment alternatives made available under the Plan reflects an attempt by Defendants as ERISA plan fiduciaries to insulate themselves from ERISA liability at the expense of participants in the Plans, including Plaintiff. Plan participants are not likely to have the investment expertise and sophistication to build an appropriate asset allocation from the hundreds of available investment choices.

87.    This fund line-up has not been streamlined as of the end of 2022.

88.    No participant should be expected to read the prospectuses for nearly 115 investment funds in order to determine which of those he should invest in. That would make choosing investments in a retirement plan a fulltime job.

89.    In that regard, it is highly doubtful that the John Muir employees charged with performing its fiduciary responsibilities to Plan, read the prospectuses for those 115 funds, much less the hundreds of other prospectuses for competing funds of the ones selected, in order to choose the final 115.

### THE MULTI-RECORDKEEPER PLATFORM IS INEFFICIENT

90.    Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

91.    According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See LIMRA Retirement Research, 403(b) Plan Sponsor Research (2013)*, available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

92.    The benefits of using a single recordkeeper are clear:

> By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[4]

The Standard, available at https://www.standard.com/pensions/publications/14883_1109.pdf.

93.    In a study titled "How 403(b) Plan Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", Aon Hewitt recognized:

403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

– Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate competitive pricing.

Aon Hewitt, *How 403(b) Plan are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).

94.    Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[2]

95.    Others in the industry agree. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience*, PLANSPONSOR (Dec. 6, 2012) ("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses.

_____

[2] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1

Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers."); Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010) (identifying, among other things, the key disadvantages of maintaining a multi-provider retirement plan recordkeeping platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").

96.    Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the retirement plans. See *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").

97.    Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continue to contract with *two* recordkeepers (Fidelity and Lincoln).

98.     The inefficient and costly structure maintained by Defendants has caused Plan participants to pay and continue to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services. There is no prudent reason for Defendant's failure to engage in a process to reduce duplicative services and investments, and the fees charged to the Plan or to continue with two recordkeepers to the present.

99.     Each of the Plans' recordkeepers received, or currently receives, compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plans and their investments for providing these duplicative services.

100.    There is no prudent or practical reason for Defendants' failure to engage in a process to reduce duplicative services and the fees charged to the Plans or to continue with multiple platform providers to the present.

## THE PLAN PAID UNREASONABLE TOTAL RKA FEES TO FIDELITY AND LINCOLN DURING THE CLASS PERIOD

101.    A plan fiduciary must continuously monitor its Total RKA fees by regularly conducting an independent evaluation of those fees to ensure they are reasonable and remove recordkeepers if those fees become unreasonable. *See Hughes*, 142 S. Ct. at 742.

102.    During the Class Period, Defendants egregiously failed to monitor the Plan's Total RK&A fees paid to Fidelity and Lincoln or to consider employing a single recordkeeper with fewer investment option, thereby causing Plaintiff, and Plan participants, to pay and continue to pay duplicative, excessive and unreasonable fees for Total RKA.

103.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from single recordkeepers with fewer investment options in order to avoid paying unreasonable Total RKA fees.

104.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Total RKA fees it paid to Fidelity and Lincoln and in light of the level and quality of Total RKA services it received that were materially similar to services available through other single recordkeepers and provided to other massive plans.

105.     As set forth in the table below, from the years 2018 through 2023, based upon information provided in 5500 Forms filed with the DOL and Participant Fee Disclosures, the Plan paid an effective average annual Total RKA fee of $132 annually per participant, while a reasonable rate for materially similar Total RKA services for a plan the size of John Muir should have been $25 annually per participant.

### Total Recordkeeping and Administration (Total RKA) Fees

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Average |
|---|---|---|---|---|---|---|---|
| Participants | 8,152 | 6,690 | 7,234 | 7,206 | 7,177 | 7,177 | 7,273 |
| Est. Total RKA Fees | $907,323 | $844,566 | $834,038 | $1,053,075 | $993,778 | $993,778 | $937,760 |
| Est. Total RKA Per Participant | $111 | $126 | $115 | $146 | $138 | $138 | $129 |
| Reliable Est. of Reasonable Total RKA Fees | $293,472 | $240,840 | $260,424 | $259,398 | $258,372 | $258,372 | $261,813 |
| Reliable Est. of Reasonable Total RKA Fees Per PP | $36 | $36 | $36 | $36 | $36 | $36 | $36 |

106.     The table below illustrates the annual Total RKA fees paid by other comparable plans of similar size, receiving a materially similar level and quality of Total RKA services in 2018.

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500 for 2018 Plan Year**

| Plan | Participants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| Daimler Trucks North America, L.L.C. UAW Retirement Savings Plan | 6,804 | $246,614 | $36 | Voya |
| BlueCross/BlueShield of Tennessee Employee Retirement Savings Program | 7,550 | $250,409 | $33 | Fidelity |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund | 8,067 | $336,660 | $42 | Vanguard |
| **John Muir Health 403B Plan 2018 Fee** | **8,152** | **$907,323** | **$111** | **Fidelity and Lincoln** |
| IGT 401 (K) Retirement Savings Plan | 8,369 | $319,326 | $38 | Fidelity |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $322,496 | $36 | Fidelity |
| Children's Medical Center of Dallas Employee Savings Plan 403(B) | 9,356 | $337,416 | $36 | Fidelity |
| Vibra Healthcare Retirement Plan | 9,750 | $277,532 | $28 | Great-West |

107.    To determine the Total RKA fees that other comparable plans are paying, Plaintiff considered both the direct and indirect compensation collected by recordkeepers as disclosed on publicly available Form 5500s and on Participant Fee Disclosures.

108.    To provide evidence that the Plan paid unreasonable and excessive fees for Total RKA services, the Plaintiff considered the Total RKA fee rates set forth in participant fee disclosures of other comparable plans when that information was available.

109.    The evidence of the Total RKA fee rates paid by these comparable plans provides evidence that the Total RKA fees paid by the John Muir Plan were excessive and unreasonable and leads to an inference that the Plan fiduciaries employed an imprudent process.

110.    Plaintiff does not definitively contend that the fiduciaries of these comparable plans followed a prudent process. Rather, the Total RKA fee rates paid by each of these comparable plans

provides evidence that the Plan paid excessive fees because there are no RKA services offered by any recordkeeper that would warrant or reasonably explain the disparity between the effective Total RKA fee rate paid by the Plan and the Total RKA fee rate that other comparable plans received for the materially similar Total RKA services during the Class Period.

111.    For example, as set forth in the John Muir Health Plan's Required Disclosures as of December 31, 2022, Plaintiff was charged a "Recordkeeping Fee," defined as "[t]he annual Plan level fee is $88.00 multiplied by the number of participants. This amount will be deducted from participant accounts proportionally based upon account balance. For example, if your account balance is $10,000.00 you will have an estimated between $2.00 and $12.00 per year deducted quarterly."

112.    The Plan's Total RKA fee rate of $129/pp, as well as the Total RKA fee rate for other years within the Class Period, can then be compared to the Total RKA fee rate of other comparable plans.

113.    The Plan's Total RKA fee rate range of $111/pp to $146/pp can be compared to the much lower Total RKA fee rate of other comparable plans.

114.    That being said, the market for RKA services is not transparent.  In most cases the Required Fee Disclosure documents are not publicly available and are not published by recordkeepers.  Plaintiff does not have the ability to obtain the participant fee disclosure documents for all plans that have a range of participants similar to the Plan.

115.    The following paragraphs outline the Total RKA fees reported by the comparator plans for the same all-encompassing recordkeeping and administrative services provided by all massive plans like the John Muir Plan.

116.     Specifically, each of the comparable plans identified below is among the closest 8/100th of 1% (0.08%) of all the defined contribution plans covered by ERISA. There were around 657,265 plans in 2018 and only 496 plans had between 6,804 and 9,750 participants with a balance greater than zero at year-end. Therefore, 656,769 plans or 99.92% of all plans have either less than 6,804 or more than 9,750 participants.

117.     Plans containing between 6,804 and 9,750 participants are indisputably among the most meaningful and appropriate to use as similarly situated comparable plans and are superior to the remaining 99.92% of all the defined contribution plans governed by ERISA in 2018.

118.     **Daimler Trucks North America, L.L.C. UAW Retirement Savings Plan** ("Daimler Trucks"): The reliable estimate of $36/pp is comprised of $36/pp of direct compensation paid to Voya from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

119.     The Daimler Trucks plan is a meaningful benchmark because at the end of 2018 the Daimler Trucks plan had around 6,804 participants, slightly less than the 8,152 participants in the Plan. As noted above, the Daimler Trucks plan is among the closest 0.08% of all defined contribution plans covered by ERISA.  The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Daimler Trucks plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Daimler Trucks plan and the fees paid by the Plan.

120.    For example, the disparity of $75/pp between the $36/pp Total RKA rate for the Daimler Trucks plan's fee compared to the lowest estimated Total RKA effective rate of $111/pp paid by the Plan represents over $610,000 annually and would conservatively represent more than 12,200 hours of RKA services in one year provided by employees of the recordkeeper. As described above, there are no special or different RKA services provided to any plan with between around 6,800 and 9,750 participants that would reasonably warrant incremental additional fees of over $610,000 for plans with similar numbers of participants.

121.    Therefore, if the Daimler Trucks plan can obtain a Total RKA fee of $36/pp with 6,804 participants, then the Plan, with 8,152 participants at the end of 2018, should be able to obtain a Total RKA fee of around $36/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate.

122.    **BlueCross/BlueShield of Tennessee Employee Retirement Savings Program** ("BCBSTN"): The reliable estimate of $33/pp is comprised of negative $61/pp of direct compensation paid to Fidelity from Form 5500 Schedule C and a calculation of $94/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

123.    The BCBSTN plan is a meaningful benchmark because at the end of 2018 the BCBSTN plan had around 7,550 participants, slightly less than the 8,152 participants in the Plan. As noted above, the BCBSTN plan is among the closest 0.08% of all defined contribution plans covered by ERISA.  The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the BCBSTN plan and the Plan

and any service differentials cannot explain the disparity between the fees paid by the BCBSTN plan and the fees paid by the Plan.

124.    For example, the disparity of $78/pp between the $33/pp Total RKA rate for the BCBSTN plan's fee compared to the lowest estimated Total RKA effective rate of $111/pp paid by the Plan represents over $630,000 annually and would conservatively represent more than 12,600 hours of RKA services in one year provided by employees of the recordkeeper. As described above, there are no special or different RKA services provided to any plan with between around 6,800 and 9,750 participants that would reasonably warrant incremental additional fees of over $630,000 for plans with similar numbers of participants.

125.    Therefore, if the BCBSTN plan can obtain a Total RKA fee of $33/pp with 7,550 participants, then the Plan, with 8,152 participants at the end of 2018, should be able to obtain a Total RKA fee of around $33/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate. The fact that the Plan had around 602 more participants than the BCBSTN plan does not make the BCBSTN plan a meaningless comparable plan since it is one of the most similar 0.08% of defined contribution plans governed by ERISA.

126.    **Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund** ("BCG"): The reliable estimate of $42/pp is comprised of $41.67/pp of direct compensation paid to Vanguard from Form 5500 Schedule C and a calculation of $.07/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

127.    The BCG plan is a meaningful benchmark because at the end of 2018 the BCG plan had around 8,067 participants, slightly less than the 8,152 participants in the Plan. As noted above, the BCG plan is among the closest 0.08% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the BCG plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the BCG plan and the fees paid by the Plan.

128.    For example, the disparity of $70/pp between the $42/pp Total RKA rate for the BCG plan's fee compared to the lowest estimated Total RKA effective rate of $111/pp paid by the Plan represents over $560,000 annually and would conservatively represent more than 11,200 hours of RKA services in one year provided by employees of the recordkeeper. As described above, there are no special or different RKA services provided to any plan with between around 6,800 and 9,750 participants that would reasonably warrant incremental additional fees of over $560,000 for plans with similar numbers of participants.

129.    Therefore, if the BCG plan can obtain a Total RKA fee of $42/pp with 8,067 participants, then the Plan, with 8,152 participants at the end of 2018, should be able to obtain a Total RKA fee of around $42/pp, *or lower*, since it is axiomatic that, all else being equal, a plan with more participants can obtain a lower per participant Total RKA fee rate. The fact that the Plan had around 85 more participants than the BCG plan does not make the BCG plan a meaningless comparable plan since it is one of the most similar 0.08% of defined contribution plans governed by ERISA.

130.    **IGT 401 (k) Retirement Savings Plan** ("IGT"): The reliable estimate of $38/pp is comprised of $35/pp of direct compensation paid to Fidelity from Form 5500 Schedule C and a

calculation of $3/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

131.    The IGT plan is a meaningful benchmark because at the end of 2018 the IGT plan had around 8,369 participants, slightly more than the 8,152 participants in the Plan. As noted above, the IGT plan is among the closest 0.08% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the IGT plan and the Plan and any service differentials cannot explain the disparity between the RKA fees paid by the IGT plan and the RKA fees paid by the Plan.

132.    For example, the disparity of $73/pp between the $38/pp Total RKA rate for the IGT plan's fee compared to the lowest estimated Total RKA effective rate of $111/pp paid by the Plan represents over $590,000 annually and would conservatively represent more than 11,800 hours of RKA services in one year provided by employees of the recordkeeper. As described above, there are no special or different RKA services provided to any plan with between around 6,800 and 9,750 participants that would reasonably warrant incremental additional fees of over $590,000 for plans with similar numbers of participants.

133.    Therefore, if the IGT plan can obtain a Total RKA fee of $38/pp with 8,369 participants, then the Plan, with 8,152 participants at the end of 2018, should be able to obtain a Total RKA fee of around $38/pp. The fact that the Plan had around 217 fewer participants than the IGT plan does not make the IGT plan a meaningless comparable plan since it is one of the most similar 0.08% of defined contribution plans governed by ERISA.

---

*Nado v. John Muir Health et al.*      CLASS ACTION COMPLAINT      Case No.

134.   **Bausch Health Companies Inc. Retirement Savings Plan** ("Bausch"): The reliable estimate of $36/pp is comprised of $.82/pp of direct compensation paid to Fidelity from Form 5500 Schedule C and a calculation of $35.41/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

135.   The Bausch plan is a meaningful benchmark because at the end of 2018 the Bausch plan had around 8,902 participants, slightly more than the 8,152 participants in the Plan. As noted above, the Bausch plan is among the closest 0.08% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Bausch plan and the Plan and any service differentials cannot explain the disparity between the RKA fees paid by the Bausch plan and the RKA fees paid by the Plan.

136.   For example, the disparity of $75/pp between the $36/pp Total RKA rate for the Bausch plan's fee compared to the lowest estimated Total RKA effective rate of $111/pp paid by the Plan represents over $610,000 annually and would conservatively represent more than 12,200 hours of RKA services in one year provided by employees of the recordkeeper. As described above, there are no special or different RKA services provided to any plan with between around 6,800 and 9,750 participants that would reasonably warrant incremental additional fees of over $610,000 for plans with similar numbers of participants.

137.   Therefore, if the Bausch plan can obtain a Total RKA fee of $36/pp with 8,902 participants, then the Plan, with 8,152 participants at the end of 2018, should be able to obtain a

Total RKA fee of around $36/pp. The fact that the Plan had around 750 fewer participants than the Bausch plan does not make the Bausch plan a meaningless comparable plan since it is one of the most similar 0.08% of defined contribution plans governed by ERISA.

138.    **Children's Medical Center of Dallas Employee Savings Plan 403(b)** ("CMCD"): The reliable estimate of $36/pp is comprised of negative $24/pp of direct compensation paid to Fidelity from Form 5500 Schedule C and a calculation of $60/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

139.    The CMCD plan is a meaningful benchmark because at the end of 2018 the CMCD plan had around 9,356 participants, slightly more than the 8,152 participants in the Plan. As noted above, the CMCD plan is among the closest 0.08% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the CMCD plan and the Plan and any service differentials cannot explain the disparity between the RKA fees paid by the CMCD plan and the RKA fees paid by the Plan.

140.    For example, the disparity of $75/pp between the $36/pp Total RKA rate for the CMCD plan's fee compared to the lowest estimated Total RKA effective rate of $111/pp paid by the Plan represents over $610,000 annually and would conservatively represent more than 12,200 hours of RKA services in one year provided by employees of the recordkeeper. As described above, there are no special or different RKA services provided to any plan with between around 6,800

and 9,750 participants that would reasonably warrant incremental additional fees of over $610,000 for plans with similar numbers of participants.

141.    Therefore, if the CMCD plan can obtain a Total RKA fee of $36/pp with 9,356 participants, then the Plan, with 8,152 participants at the end of 2018, should be able to obtain a Total RKA fee of around $36/pp. The fact that the Plan had around 1,204 fewer participants than the CMCD plan does not make the CMCD plan a meaningless comparable plan since it is one of the most similar 0.08% of defined contribution plans governed by ERISA.

142.    **Vibra Healthcare Retirement Plan** ("Vibra"): The reliable estimate of $28/pp is comprised of $27/pp of direct compensation paid to Great-West (now Empower) from Form 5500 Schedule C and a calculation of $1/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

143.    The Vibra plan is a meaningful benchmark because at the end of 2018 the Vibra plan had around 9,750 participants, slightly more than the 8,152 participants in the Plan. As noted above, the Vibra plan is among the closest 0.08% of all defined contribution plans covered by ERISA. The costs to a recordkeeper for providing RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Vibra plan and the Plan and any service differentials cannot explain the disparity between the RKA fees paid by the Vibra plan and the RKA fees paid by the Plan.

144.    For example, the disparity of $83/pp between the $28/pp Total RKA rate for the Vibra plan's fee compared to the lowest estimated Total RKA effective rate of $111/pp paid by the

Plan represents over $670,000 annually and would conservatively represent more than 13,400 hours of RKA services in one year provided by employees of the recordkeeper. As described above, there are no special or different RKA services provided to any plan with between around 6,800 and 9,750 participants that would reasonably warrant incremental additional fees of over $670,000 for plans with similar numbers of participants.

145.    As a result, the primary driver of the Bundled RKA fees that recordkeepers would initially bid, and the resulting Total RKA fees that a recordkeeper would earn, to provide RKA services is the number of participants in the plan. Therefore, if the Vibra plan can obtain a Total RKA fee of $28/pp with 9,750 participants, then the Plan, with 8,152 participants at the end of 2018, should be able to obtain a Total RKA fee of around $28/pp. The fact that the Plan had around 1,598 fewer participants than the Vibra plan does not make the Vibra plan a meaningless comparable plan since it is one of the most similar 0.08% of defined contribution plans governed by ERISA.

146.    Viewing all the data points provided by the comparable plan set forth above holistically and in the full context of how the retirement plan industry operates, provides sufficient evidence to support a plausible inference that the Plan paid unreasonable and excessive fees for Total RKA services.

147.    The  Total RKA services received by these comparator plans were materially identical to the Total RKA services received by the John Muir Plan in the form of recordkeeping, trustee, accounting, and other administrative fees, based on the highly similar nature of such services in the market place and a comparison of the participant fee disclosures of the comparator plans to the services received by the John Muir Plan.

148.    Although some of the comparators utilize different service or compensation codes for the services received on the 5500 Form, because Total RKA services and fees for massive plans like the John Muir Plan are fungible and commoditized, any differences between the plans in these codes are immaterial from a pricing perspective.

149.    The graph below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes, receiving a materially similar level and quality of RKA services in 2018, compared to the 2018 Total RKA fees paid by the John Muir Plan, with the white data points representing Total RKA fees that recordkeepers offered to (and were accepted by) comparable plans.



150.    The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several recordkeepers, including Fidelity itself, serving the market for similarly-sized plans would be willing to accept in a competitive environment to provide Total RKA services to the John Muir Plan.

151.    The table and graph above illustrate that the Plan paid a Total RKA fee of $111 per participant for 2018.

152.    A reasonable Total RKA fee for 2018 for the John Muir Plan based on the services provided by existing recordkeepers based on the graph and charts above would have been $36 per participant.

153.    The Total RKA fees paid by the Plan to Fidelity/Lincoln during the Class Period were excessive relative to the Total RKA services rendered given the commoditized and fungible nature of RKA fees for massive plans like the John Muir Plan.

154.    From the years 2018 through 2023, and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $937,760 per year in Total RKA fees, which equated to an effective average of approximately $129 per participant per year.

155.    A hypothetical prudent plan fiduciary would not agree to pay *a 258% premium* for what they could otherwise pay for the materially similar level and quality of Total RKA services.

156.    From the years 2018 through 2023, and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, the Plan additionally cost its participants on average approximately $675,947 per year in additional recordkeeping fees, which equates to on average approximately $93 per participant per year.

157.    From the years 2018 to 2023, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially similar level and quality of services, the Plan actually cost its participants a Total minimum amount of approximately $4,055,680 in unreasonable and excessive Total RK&A fees.

158.    From the years 2018 to 2023, based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with a materially similar level and quality of services, the Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a Total cumulative amount in excess of $5,767,721 in Total RKA fees.

159.    Defendants failed to take advantage of the Plan's mammoth size to timely negotiate lower fees or rebates from its existing recordkeepers, Lincoln and Fidelity.

160.    Defendants could have obtained materially similar Total RKA services for much less from one single other recordkeeper had it only leveraged its massive size.

161.    It can be plausibly inferred from the unreasonably high fees it paid for Total RKA services during the Class Period that Defendants did not conduct an effective or competitive solicitation of bids for Total RKA services, and failed to use the Plan's massive size to negotiate rebates from Fidelity and Lincoln.

162.    Plaintiff and Class Members paid all of these excessive Total RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

163.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Total RKA fees than they should have been and/or by failing to take effective remedial actions, Defendants breached their fiduciary duty of prudence to Plaintiff and to other Plan participants, causing millions of dollars of harm to Plaintiff's and Class Member's retirement accounts.

## JOHN MUIR'S DISLOYAL USE OF PLAN FORFEITURES

164.    The Plan is funded by a combination of wage withholdings by Plan participants and Company matching and non-elective contributions, each of which is deposited into the Plan's trust fund.

165.    Employer contributions are based on the participant's entry date into the Plan, and generally range from 50% of the first 6% to 100% of the first 5% of a participant's salary deferral.

166.    Upon their deposit into the Plan's trust fund, all participant contributions and Company contributions become assets of the Plan.

167.    As an individual account, defined contribution retirement plan, the John Muir Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

168.    Participants are fully vested in their salary deferrals plus actual earnings thereon. Vesting in Employer contributions is based on years of qualified service with increases in increments of 20% per year until fully vested after five years.

169.    Forfeitures are the nonvested portion of a participant's account that is lost upon termination of employment.

170.    Forfeitures are retained in the Plan and are used for future employer contributions.

171.    In 2018, Company non-elective contributions to the Plan were reduced by $87,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any part of the $904,553 in Plan expenses.

172.    In 2019, Company non-elective contributions to the Plan were reduced by $87,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any part of the $841,515 in Plan expenses.

173.    In 2020, Company non-elective contributions to the Plan were reduced by $131,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any part of the $830,557 in Plan expenses.

174.    In 2021, Company non-elective contributions to the Plan were reduced by $154,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any part of the $1,052,553 in Plan expenses.

175.    In 2022, Company non-elective contributions to the Plan were reduced by $117,000 as a result of Defendants' reallocation of forfeited funds for the Company's own benefit, and no forfeited funds were used to pay any part of the $994,348 in Plan expenses.

176.    From 2018-2022, Defendants used forfeited funds to reduce the Company's contributions to the John Muir Plan by at least $576,000.  That money should have been applied to annual Plan expenses and reduce participant Total RKA, which would have been in the best interest of Plan participants and beneficiaries.

177.    Defendants have not used the forfeited funds to pay Plan expenses, and have thereby failed to reduce or eliminate the amounts charged to the participants' individual accounts to cover such expenses.

178.    Defendants have consistently utilized the forfeited funds in the Plan exclusively for the Company's own benefit, to the detriment of the Plan and its participants, by using these Plan assets solely to reduce John Muir's future contributions to the Plan.

179.    While Defendants' reallocation of the forfeitures in the Plan's trust fund to reduce its future non-elective contributions benefitted the Company by reducing its own contribution expenses, it harmed the Plan, along with its participants and beneficiaries, by reducing future Company contributions that would otherwise have increased Plan assets and by causing participants to incur deductions from their individual accounts each year to cover administrative expenses that would otherwise have been covered in whole or in part by utilizing forfeited funds.

180.    In so doing, Defendants breached their fiduciary duty of loyalty to the Plan and cost the Plaintiff and class members millions of dollars of lost retirement income.

## CLASS ACTION ALLEGATIONS

181.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

182.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the John Muir Health 403(b) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning March 15, 2018, and running through the date of judgment.

183.    The Class includes over 7,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

184.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owes fiduciary duties to the Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

185.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff and the other class members were Participants during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

186.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

187.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

188.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

189.    Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

190.    The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

191.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

192.    Any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF
**Breach of Duty of Prudence Under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against**
**Defendants – Total RKA Fees)**

193.    Plaintiff restates the above allegations as if fully set forth herein.

194.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

195.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in its administration of the Plan.

196.     Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable Total RKA fees.

197.     During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's Total RKA fees were reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

198.     During the Class Period, Defendants breached its fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's Total RKA fees were reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

199.     During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeepers, Fidelity and Lincoln, to make sure they were providing the Total RKA services at reasonable cost, given the highly competitive, commodified and fungible market surrounding recordkeeping and the enormous bargaining power the Plan had to negotiate the best fees, and remove Fidelity and Lincoln for a single recordkeeper who provided fewer investment choices and thereby, provided RKA services at objectively unreasonable fee levels.

200.     During the Class Period, Defendants breached their duty to Plan participants, including to Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

201.     Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

202.    As a result of Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses.

203.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the John Muir Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### Breach Of Fiduciary Duty of Loyalty Under ERISA, as Amended
### (Plaintiff, on behalf of himself and Class, Against
### Defendants – Forfeitures)

204.    Plaintiff restates the above allegations as if fully set forth herein.

205.    Pursuant to 29 U.S.C. § 1104(a)(1)(A), Defendants were required to discharge their duties to the  Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

206.    Defendants have continually breached this duty of loyalty with respect to their control and management of the Plan's assets throughout the Class Period by utilizing forfeited funds in the Plan for the benefit of the Company rather than solely in the interest of the participants and beneficiaries.

207.    Instead of acting solely in the interest of Plan participants by utilizing forfeited funds in the Plan to reduce or eliminate the administrative expenses charged to their individual accounts, Defendants chose to use these Plan assets for the exclusive purpose of reducing its own future contributions to the Plan, thereby saving the Company millions of dollars at the expense of

the Plan which received decreased Company contributions and its participants and beneficiaries who were forced to incur avoidable expense deductions to their individual accounts.

208.    As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan suffered injury and loss for which they are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

**THIRD CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other**
**Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of Himself and Class,**
**Against Defendants – Total RKA Fees)**

209.    Plaintiff restates the above allegations as if fully set forth herein.

210.    Defendants had the authority to appoint and remove members or individuals responsible for Plan Total RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

211.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan Total RKA fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

212.    Defendants had a duty to ensure that the individuals responsible for Plan Total RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's Total RKA fees; and reported regularly to Defendants.

213. The unreasonable Total RKA fees paid by the Plan inferentially establish that Defendants breached their duty to monitor by, among other things:

    a. Failing to monitor and evaluate the performance of individuals responsible for Plan Total RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonable Total RKA expenses;

    b. Failing to monitor the process by which the Plan's recordkeepers, Fidelity/Lincoln, were evaluated, and failing to investigate the availability of more reasonably-priced recordkeepers; and

    c. Failing to remove individuals responsible for Plan Total RKA fees whose performance was inadequate in that these individuals continued to pay the same Total RKA fees over numerous years even though solicitation of competitive bids would have shown that maintaining Fidelity/Lincoln as the recordkeepers at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiff's and other Plan participants' retirement savings.

214. As the consequences of the breaches of the duty to monitor for Total RKA fees, the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable monetary losses.

215. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the John Muir Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Total RKA fees. In addition, Plaintiff and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other**
**Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of Himself and Class,**
**Against Defendants – Forfeitures)**

216. Plaintiff restates the above allegations as if fully set forth herein.

217.    Defendants had the authority to appoint and remove members or individuals responsible for forfeiture management and usage and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

218.    In light of this authority, Defendants had a duty to monitor those individuals responsible for forfeiture management and usage to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

219.    Defendants had a duty to ensure that the individuals responsible for forfeiture management and usage possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to forfeiture management and usage; and reported regularly to Defendants.

220.    The disloyal use of Plan forfeitures inferentially establish that Defendants breached their duty to monitor by, among other things:

    a.  Failing to monitor and evaluate the performance of individuals responsible for forfeiture management and usage or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of disloyal forfeiture management and usage; and

    b.  Failing to remove individuals responsible for forfeiture management and usage whose performance was inadequate in that these forfeitures were used to benefit John Muir rather than the Plan and its participants and beneficiaries.

221.    As the consequences of the breaches of the duty to monitor forfeiture management and usage, the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable monetary losses.

222.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the John Muir Plan all losses caused by their failure to adequately monitor individuals responsible for forfeiture management and usage. In addition, Plaintiff and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration the Defendants are fiduciaries, have breached their fiduciary duty of loyalty and prudence under ERISA, causing harm to Plan participants and beneficiaries;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable Total RKA fees and permitting forfeitures to go to John Muir, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order requiring John Muir to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against John Muir as necessary to effectuate relief, and to prevent John Muir's unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

1

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the
common fund doctrine; and

2

3

J.    Such other and further relief as the Court deems equitable and just.

4

Respectfully submitted,

5    Date: March 15, 2024                      **SCHNEIDER WALLCE
COTTRELL KONECKY LLP**

6

7                                             _/s/James A. Bloom_
James A. Bloom

8                                             Todd M. Schneider
2000 Powell Street, Suite 1400

9                                             Emeryville, CA 94608
Telephone: (415) 421-7100

10                                            Fax: (415) 421-7105
Email: jbloom@schneiderwallace.com

11                                            tschneider@schneiderwallace.com

12                                            **WALCHESKE & LUZI, LLC**

13                                            Paul M. Secunda*

14                                            _Pro Hac Vice Motion Pending_
235 N. Executive Dr., Suite 240

15                                            Brookfield, Wisconsin 53005
Telephone: (414) 828-2372

16                                            Fax: (262) 565-6469
psecunda@walcheskeluzi.com

17

18                                            _Attorneys for Plaintiff and Proposed Class_

19

20

21

22

23

24

25

26

27

28

---